UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RODNEY D. HARRISON

        **Plaintiff,**          CIVIL ACTION NO. 06-CV-10393-DT

        vs.          DISTRICT JUDGE PAUL V. GADOLA

**COMMISSIONER OF**          MAGISTRATE JUDGE MONA K. MAJZOUB
**SOCIAL SECURITY,**

        **Defendant.**
_____/

## REPORT AND RECOMMENDATION

**I.**     **RECOMMENDATION**

This Court recommends that Defendant's Motion for Summary Judgment be **GRANTED** (Docket # 13), that Plaintiff's Motion for Summary Judgment be **DENIED** (Docket # 17), and that Plaintiff's Complaint be **DISMISSED**.

**II.**     **PROCEDURAL HISTORY**

This is an action for judicial review of the final decision by the Commissioner of Social Security that the Plaintiff was not "disabled" for purposes of the Social Security Act. 42 U.S.C. §§ 423, 1382. The issue for review is whether the Commissioner's decision is supported by substantial evidence.

Plaintiff Rodney Harrison filed an application for Disability Insurance Benefits (DIB) in June 30, 2003. (Tr. 41A-41C). He alleged he had been disabled since March 30, 2003 due to back pain caused by an automobile accident. (Tr. 41A-41C, 263). Plaintiff's claims were initially denied in December 2004. (Tr. 30-34). Plaintiff sought a review hearing before an Administrative Law Judge (ALJ). (Tr. 35). A hearing took place before ALJ Michael Wilenkin on June 7, 2005. (Tr. 252-88). Plaintiff was represented by an attorney at the hearing. (Tr. 29, 252-53). The ALJ denied Plaintiff's claims in an opinion issued on July 26, 2005. (Tr. 11-23). The Appeals Council denied review of the

ALJ's decision on November 25, 2005 and the ALJ's decision is now the final decision of the Commissioner. (Tr. 4-6). Plaintiff, acting *in pro per*, appealed the denial of his claims to this Court, and both parties have filed motions for summary judgment.

## III. MEDICAL HISTORY

### A. Medical Evidence Dated Pre-March 2003

Plaintiff was admitted to the emergency room on October 22, 2001 after being involved in a motor vehicle accident. (Tr. 98-102). He had multiple traumatic injuries, a contusion to his chest, and cervical, dorsal, and lumbar myositis.[1] A CT scan of Plaintiff's cervical spine was negative. (Tr. 99). X-rays of his cervical, thoracic, and lumbar spine were normal although some degenerative changes in the lower cervical spine were noted. (Tr. 100-21). Plaintiff was subsequently discharged with a prescription for Flexeril and Tylenol #3 and instructions to see his personal physician. (Tr. 99). An MRI later taken in November 2001 showed a mild disk protrusion at L4-5. (Tr. 136-37).

Dr. Heather N. Britton, a board certified neurologist, treated Plaintiff in December 2001. Plaintiff stated he was feeling better and was able to walk faster although he continued to complain of pain. Dr. Britton noted that Plaintiff had an improved range of motion in the neck and lower back upon extension and flexion and he also had 5/5 strength. There was some tenderness on palpation at the posterior cervical and lower lumbar regions. (Tr. 104). Dr. Britton kept Plaintiff off of work for four weeks and prescribed continued physical therapy three times a week for four weeks and Darvocet-N 100 as needed. *Id.*

---

[1] Myositis is the "inflammation of a voluntary muscle." *Dorland's Illustrated Medical Dictionary* 1216 (30th ed. 2003).

Dr. Britton also evaluated Plaintiff on January 28, 2002. Her notes indicate that Plaintiff had reported feeling better five days earlier but had come to see her on an emergency basis due to a sharp, radiating pain in the left side of his back. Dr. Britton noted significant muscle spasms on the left side with palpitation and tenderness. Dr. Britton also stated that Plaintiff had not yet picked up his Tylenol #3 prescription. He was instructed to do so. Dr. Britton also prescribed Flexeril and recommended that Plaintiff rest and go to physical therapy. Dr. Britton released Plaintiff to light work after February 4, 2002. (Tr. 103).

Dr. Robert Johnson, a neurosurgeon, examined Plaintiff in November 2002. Plaintiff reported to Dr. Johnson that his pain pills occasionally helped but that physical therapy did not. Upon examination, Dr. Johnson found that Plaintiff was awake, alert, and oriented. He had 5/5 motor strength in his upper and lower extremities, intact sensation, normal coordination, and reflexes. There was some tenderness noted in Plaintiff's back and pain noted upon flexion and extension. A straight leg raising test was negative but there was some paralumbar spasm. (Tr. 167-68). Dr. Johnson also noted that the MRI of Plaintiff's lumbar spine showed mild disc protrusion at L4-5 with some mild degenerative disc disease at L5-S1. He recommended either continued physical therapy, epidural injections, or a discogram to see if Plaintiff was a candidate for lumbar fusion surgery. (Tr. 168). Plaintiff elected to have a discogram and was told to contact Dr. Johnson when he had the discogram results. (Tr. 166, 168).

**B.     Medical Evidence Dated Post-March 2003**

In June 2003 Dr. Johnson noted that a discogram had been attempted but was unsuccessful. Plaintiff complained of continuing back pain. Examination findings were essentially normal. Dr. Johnson recommended another discogram and continued Plaintiff on Tylenol #3. He also completed a return to work form noting that Plaintiff was expected to return on January 2, 2004 with

restrictions to include no bending, twisting, or lifting over 10 pounds and no twisting or working with arms overhead. (Tr. 162-65).

Dr. Setti Rengachary and Dr. Vasan Deshikachar examined Plaintiff in July 2003. Dr. Rengarchary noted that Plaintiff had a herniated disk and depression and that he walked with an antalgic gait and used a cane. (Tr. 116). Dr. Deshikachar's examination revealed an abnormal gait but full muscle strength. He diagnosed Plaintiff with lumbrosacral strain, anxiety, and symptomatic depression. (Tr. 140).

Dr. Paul Metler, a licensed clinical psychologist, examined Plaintiff on July 28, 2003. Plaintiff told Dr. Metler that his depression began in January 2003. He stated that he lacked energy and motivation and that he had difficulties concentrating. When asked about his personal life, Plaintiff indicated that during the day he only reads the paper and sits on the porch after bathing in the morning. He further revealed that he was a religious man who prays. He stated he had no visitors or friends but he did have a "lady friend". Plaintiff also told Dr. Metler that he did not have any contact with his family members. Plaintiff also informed Dr. Metler that he had suicidal ideation but denied any attempts in large part due to his relationship with his son. Dr. Metler diagnosed Plaintiff with depression not otherwise specified and recommended that Plaintiff see a psychiatrist and consider psychotropic medication. (Tr. 143-44).

In early August 2003 another neurosurgeon, Dr. Miguel Lis-Planells examined Plaintiff. He noted that Plaintiff had tenderness in his lumbar spine with a decreased range of motion but no spasms. There was also full muscle strength, intact sensations, normal reflexes, and a normal gait. Dr. Lis-Planells opined that Plaintiff's low back pain was possibly mechanical in nature and that there was no evidence of active lumbar radiculopathy. (Tr. 159). He recommended a repeat MRI of Plaintiff's lumbar spine. Dr. Lis-Planells also advised Plaintiff to pursue therapy or epidural injections. (Tr. 159).

A subsequent MRI of Plaintiff's lumbar spine showed mild degenerative disc disease at T12-L1 and borderline central canal stenosis and mild degenerative disc disease at L5-S1. (Tr. 147, 209). Dr. Lis-Planells' examination of Plaintiff in late August revealed a negative straight leg raising test, full muscle strength, and no spasms but a decreased range of lumbar motion. There were no sensory deficits in the lower extremities. His gait was antalgic and he was able to heel and toe stand. Dr. Lis-Panells indicated that there was no evidence of significant disc herniation or spinal canal stenosis or active lumbar radiculpathy. Conservative treatment consisting of therapy and epidural injections were recommended. Plaintiff declined to have the epidural injections. Dr. Lis-Planells deemed Plaintiff capable of sedentary work. (Tr. 200-01).

Dr. R. Hasan completed a psychiatric evaluation of Plaintiff on August 22, 2003. Plaintiff told Dr. Hasan that he had been intermittently depressed for the past two years. He also told Dr. Hasan that he had flashbacks of the car accident, nightmares, and short term memory problems. Plaintiff denied any suicidal ideation. When asked about his personal life, Plaintiff revealed that he was divorced and lived with his brother who does most of the chores and cooking. He stated he was able to care for his own basic needs and to do some light cooking. Plaintiff stated that he spent most of his day watching television and that he attended church regularly. Dr. Hasan ultimately diagnosed Plaintiff with adjustment disorder with depressed

mood and assigned him a Global Assessment of Functioning ("GAF") score of 55 to 65[2]. (Tr. 148-150).

Plaintiff had a follow-up appointment with Dr. Lis-Planells in September 2003. His findings were essentially the same as those from August although Plaintiff's gait was now antalgic. Dr. Lis-Panells again indicated that there was no evidence of significant disc herniation, spinal canal stenosis, or active lumbar radiculpathy. Dr. Lis-Planells opined that Plaintiff could perform sedentary work. Plaintiff again refused the epidural injections. (Tr. 156-57; 198-99).

Dr. Sasha Yousef, a state agency medical consultant, completed a Psychiatric Review Technique form on September 16, 2003 after reviewing Dr. Hasan's report. (Tr. 72-85). Dr. Yousef diagnosed Plaintiff with adjustment disorder with depressed mood and dysthymic disorder. (Tr. 75). She concluded that Plaintiff had no restrictions of daily living or episodes of decompensation but that he had mild difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence and pace. (Tr. 82). Dr. Yousef also completed a mental residual functional capacity assessment (RFC") form wherein she opined that Plaintiff had moderate limitations in his ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; and (3) maintain attention and concentration for extended periods. (Tr. 86). She therefore concluded that

---

[2] The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, (4th ed., text rev. 2000) at 32-34 ("DSM-IV"). It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *See id*. A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning. A GAF score of 65 is indicative of only mild dysfunction. *Id.*

Plaintiff remained mentally capable of performing simple, unskilled tasks on a sustained basis. (Tr. 88).

Dr. Lis-Planells examined Plaintiff in October 2003. He reported that Plaintiff's back pain was related to standing, walking, and bending and that Plaintiff could not perform heavy, household lifting. Dr. Lis-Planells' examination findings were consistent with those reported in August and September although Plaintiff's gait was noted to be normal. Dr. Lis-Planells commented that Plaintiff was eager to be considered for surgical treatment of his back due to the pain. (Tr. 154, 195).

Dr. Johnson noted in early November 2003 that Plaintiff elected to have posterior, rather than anterior, lumbar interbody fusion surgery. At this time, an examination of Plaintiff's lower extremities was normal, with the exception of mild weakness. (Tr. 152, 194).

Another state agency medical consultant completed a Physical RFC Assessment form in November 2003 after reviewing Plaintiff's medical records dated March to October 2003. (Tr. 90-97). The consultant opined that Plaintiff was capable of performing light work with an ability to sit/stand/walk for 6 hours out of an 8-hour workday, to frequently kneel, and to occasionally climb, balance, stoop, crouch, and crawl. (Tr. 91-92).

Plaintiff went to the emergency room for chest pain in November 2003. Test results were within normal limits. (184-87). An examination of Plaintiff's lower extremities was also normal at this time and it was noted that his gait was essentially normal. *Id.*

Plaintiff underwent the elective L5-S1 posterior lumbar interfusion surgery in January 2004. (Tr. 169). By April 2004 Dr. Johnson noted that Plaintiff was doing well. He did not have lower back pain and he showed slow improvement despite not having had physical therapy. (Tr. 191). Plaintiff was able to ambulate well with minimal antalgia. Motor, sensory, coordination, and reflex examinations were normal. Dr. Johnson kept Plaintiff off of work until June 1, 2004. *Id.* In August 2003 Dr. Johnson

commented that Plaintiff continued to do well and had no lower back pain. He was ambulating normally. Plaintiff had undertaken some physical therapy but was no longer doing so. Dr. Johnson released Plaintiff to work but indicated that he should only do sedentary work with no repetitive bending, twisting, or lifting greater than 10 pounds with no heavy lifting or bending. (Tr. 189).

## IV.      HEARING TESTIMONY

### A.      Plaintiff's Testimony

Plaintiff was 38 years old when he appeared before the ALJ. (Tr. 255). He verified that he was seeking a closed period of disability between March 30, 2003 and December 27, 2004. (Tr. 254-55, 262). Plaintiff testified that he had graduated from high school and had completed two years of college. (Tr. 256). He also told the ALJ that he was involved in a motor vehicle accident in October 2001. He subsequently quit work as an operation manager for Costco and as a guard for Guardsmark Security Corporation because of the accident. (Tr. 256-58). Plaintiff returned to work part-time in 2002 as a security guard for a different company but quit in March 2003 due to severe back pain. (Tr. 258-60). Plaintiff returned to full-time work in 2004. (Tr. 260-62).

Plaintiff testified that his primary impairment was his back pain caused by the accident. (Tr. 262-63). He stated that he had undergone physical therapy, epidural injections, and eventually surgery on his lower back. (Tr. 263). Prior to his back surgery, Plaintiff was also taking pain medication on a daily basis. He rated the pain in his back at a 9 out of 10 even with the medication. According to Plaintiff, the pain from his back also radiated down his left leg. Plaintiff described the pain as constant and sharp, running from the middle of his back to his buttocks. (Tr. 274). He rated his leg pain at a 7 out of 10. (Tr. 263-64). Plaintiff indicated that he needed to change positions after 15 to 20 minutes of sitting because of an aching pain in his left leg. (Tr. 274-76).

After back surgery, Plaintiff subsequently developed a bacterial infection in his back as a result of his surgery. (Tr. 266). He also underwent 5 ½ weeks of in-patient rehabilitation. (Tr. 265-66). Thereafter, Plaintiff had 2 to 3 weeks of physical therapy sessions at his home. (Tr. 266). Plaintiff testified that he did not decline any therapeutic recommendations that were made although some turned out not to be feasible. (Tr. 271).

Plaintiff also told the ALJ that he used a cane to relieve the pressure on his back when he walked. (Tr. 264). The ALJ commented that Plaintiff was not using a cane at the hearing. (Tr. 266). Plaintiff stated that he stopped using it around December 18, 2004, which he acknowledged was when he returned to full-time work. (Tr. 267). Plaintiff further testified that he had to lie down for 8 to 10 hours a day, broken down into two segments, to relieve his back pressure. (Tr. 268-70, 281). He also stated that he became depressed and thought about suicide due to the effect the back and leg pain had on his social life, including his marriage. (Tr. 278). Plaintiff said he was treated by Dr. Jeffrey Brown for about 3 months regarding these issues. (Tr. 278-79). Dr. Brown had told Plaintiff that his depression would pass. *Id.*

When asked about his daily activities during the relevant time period, Plaintiff testified that he was not able to sleep, his wife had to help him bathe, dress, and shave. He did not help with the household chores. (Tr. 279-80).

The ALJ asked Plaintiff whether his back condition had improved since the surgery. Plaintiff initially stated that it had not but then admitted that it had improved. He rated his pain post-surgery at a 5 out of 10 and indicated that he still took pain medication. (Tr. 267-68, 272).

### B.    Vocational Expert's Testimony

Dr. Asa Brown, a certified rehabilitation counselor, testified as a vocational

expert at the hearing. (Tr. 41, 282-88). The ALJ asked Dr. Brown about the type and number of jobs available in Michigan for a hypothetical individual of Plaintiff's age, education, and work experience[3] with a history of pain and discomfort in the lower back and left lower extremity treated with fairly aggressive therapeutic intervention, epidural injections, and eventual surgery. (Tr. 285). The ALJ further asked Dr. Brown to assume that the same hypothetical individual can: (1) sit for 6 hours out of an 8 hour workday; (2) stand or walk for 2 hours out of an 8 hour workday; (3) lift 10 pounds occasionally and a somewhat lesser weight frequently; (4) understand, remember, and follow instructions; (5) follow through with and complete assigned tasks in a timely manner and in an appropriate fashion; and (6) respond appropriately to customary work pressures. (Tr. 285-86). However, the individual cannot: (1) repetitively stoop, squat, kneel, crouch, or balance; (2) climb stairs or ladders; (3) engage in prolonged or protected walking; (4) excessively twist or torque the torso through extreme motion ; (5) lift the upper extremities above shoulder level. (Tr. 285).

Dr. Brown testified that the hypothetical individual described by the ALJ could perform the 4,500 semi-skilled sedentary[4] security jobs available in southeastern Michigan or the 8,500 unskilled,

---

[3] Dr. Brown also testified to the following classifications for Plaintiff's prior work with five different employers. She opined that Plaintiff's work at Costco did not last long enough to be vocationally significant. Dr. Brown also testified that Plaintiff's prior work as a security guard involved semi-skilled light and sedentary work. Plaintiff's prior retail work required semi-skilled, light work and included transferrable skills in public contact and supervision. (Tr. 282-83).

[4] Sedentary work is defined under 20 C.F.R. § 404.1567(a), which states:

Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

sedentary jobs in assembly, packaging, and inspection also available in southeastern Michigan. (Tr. 286-87). Dr. Brown further testified that the jobs she described would still be available to an individual who needed a sit/stand at-will option. (Tr. 287).[5]

## V.   LAW AND ANALYSIS

### A.   STANDARD OF REVIEW

Title 42 U.S.C. § 405(g) gives this Court jurisdiction to review the Commissioner's decisions. Judicial review of those decisions is limited to determining whether her findings are supported by substantial evidence and whether she employed the proper legal standards. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson,* 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). It is not the function of this court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

In determining whether substantial evidence supports the Commissioner's decision, the Court must examine the administrative record as a whole. *Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even where substantial evidence also supports the opposite conclusion and the reviewing court would decide the matter differently. *Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999).

---

[5] Dr. Brown also testified that Plaintiff would not be able to perform his past, relevant work or any other type of work if the ALJ credited Plaintiff's claims regarding his difficulties with activities of daily living, alleged pain, and need to lie down for 8 to 10 hours a day. (Tr. 283-84).

### B.     FRAMEWORK OF SOCIAL SECURITY DISABILITY DETERMINATIONS

The Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis.  In the first four steps, Plaintiff had to show that:

(1)     he was not presently engaged in substantial gainful employment; and

(2)     he suffered from a severe impairment; and

(3)     the impairment met or was medically equal to a "listed impairment;" or

(4)     he did not have the residual functional capacity (RFC) to perform his relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(e); 20 C.F.R. § 416.920(a)-(e). If Plaintiff's impairments prevented him from doing his past work, the Commissioner would, at step five, consider his RFC, age, education and past work experience to determine if he could perform other work.  If not, he would be deemed disabled. 20 C.F.R. § 404.1520(f).  The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform."  *Her*, 203 F.3d at 391.  To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs."  *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).  This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'"  *Id.* (citations omitted).

### C.     ANALYSIS

After concluding that Plaintiff did not engage in any substantial gainful employment during the period of closed disability, the ALJ determined that Plaintiff had "severe" impairments consisting of low back pain and left leg pain, but that those impairments did not meet or equal a listed impairment.  The ALJ also determined that Plaintiff did not have a medically determinable mental impairment, after having rejected the opinions of Dr. Hasan, and similarly Dr. Yousef.

Plaintiff raises no objections to any of these findings, and the court, having reviewed the record in its entirety, concludes that they are supported by substantial evidence.

Plaintiff's back and associated leg pain would fall under the listing for disorders of the spine. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04. The criteria for this listing require nerve root compression resulting in limited range of motion and motor loss with muscle weakness, *id.* § 1.04A; arachnoiditis with severe burning or painful dysesthesia resulting in the need for postural changes more than once every two hours, *id.* § 1.04B; or spinal stenosis resulting in the inability to ambulate effectively, *id.* § 1.04C. The record shows no evidence of nerve root compression or motor loss with muscle weakness within the relative time period. There are also no tests indicating that Plaintiff had arachnoiditis or dysesthesia. Lastly, the evidence regarding the existence of stenosis and any effect it had on Plaintiff's ability to ambulate was conflicting. It is the responsibility of the ALJ and not this Court to resolve such conflicts. *Brainard,* 889 F.2d at 681.

The ALJ also properly determined that Plaintiff did not have a medically determinable mental impairment under the listing for affective disorder after having rejected the opinions of Dr. Hasan and Dr. Yousef that Plaintiff had an adjustment disorder. The ALJ noted various discrepancies between the statements Plaintiff made to Dr. Metler and those which he made to Dr. Hasan[6] three weeks later and ultimately determined that Dr. Metler's opinion was more consistent with the evidence as a whole. Such a determination was within the ALJ's discretion. *See Pearsall v.*

---

[6] Furthermore, as noted by the ALJ, Dr. Hasan found that Plaintiff had a GAF score of 55-65 (indicative of mild to moderate impairments). This score is not necessarily inconsistent with the ALJ's determination that plaintiff retains the RFC to perform unskilled work. See 20 C.F.R. § 404.1568(a) (defining "[u]nskilled work" as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time").

*Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001). Furthermore, the ALJ noted that Plaintiff was not taking any prescribed medication for his alleged mental condition even though his doctors could prescribe it for him and that Plaintiff's treating doctor, Dr. Brown, had described Plaintiff's depression as something that would pass. The ALJ further commented that Plaintiff did not have a history of psychiatric hospitalization or long-term treatment. He also observed that Plaintiff indicated he was able to read and watch television during the day, which suggested that he could adequately concentrate. These factors provide adequate support for the ALJ's determination.

At the fourth step of the disability determination process, the ALJ concluded that Plaintiff had the RFC to perform a significant range of sedentary work, which was stated as follows:

> Accordingly, the undersigned finds during the period in question, the claimant retained the residual functional capacity to lift ten pounds occasionally and five pounds frequently. He was able to sit for 6 hours (with normal breaks) in an 8-hour workday and stand/walk for 2 hours (with normal breaks) in an 8-hour workday. However, he had to be allowed, while remaining at his workstation, to change positions at will in order to relieve discomfort. The claimant could not do any repetitive stooping, squatting, kneeling, crouching, balancing or climbing of stairs or ladders nor could he do excessive twisting and torquing of his body beyond his range of motion or use his upper extremities above shoulder level. The claimant was able to understand, remember and carry out instructions, complete tasks in a timely manner and respond appropriately to customary work pressures, co-workers and supervisors.

(Tr. 19-20). The ALJ thus concluded that Plaintiff was not disabled. As discussed below, the record contains ample support for this determination.

The record shows that the ALJ's assessment of Plaintiff's RFC is consistent with the opinions of his treating physicians. In June 2003, Dr. Johnson opined that Plaintiff could return to work as long as he was not required to bend, twist, or lift over 10 pounds or twist or work with his arms overhead. (Tr. 162-65). Dr. Lis-Planells deemed Plaintiff capable of sedentary work in August and September 2003. (Tr. 156-57, 200-01). Post-surgery, Dr. Johnson released Plaintiff to sedentary

work that did not require repetitive bending, twisting, or lifting greater than 10 pounds. (Tr. 189). The restrictions were incorporated into the ALJ's RFC finding, which is thus supported by substantial evidence.

Plaintiff's testimony regarding the extent of his pain and limitations, if accepted as credible, might support a finding that he is incapable of engaging in any substantial gainful activity. However, the ALJ found that Plaintiff's testimony was not fully credible. Such determinations are entitled to significant deference, *Walters v. Commissioner of Social Sec.*, 127 F.3d 525, 531 (6th Cir. 1997), and there is nothing in the record that would warrant the court in disturbing the ALJ's credibility determination in this matter.

As noted above, there is no evidence in the record of any muscle spasms, significant muscle atrophy, or neurological deficits after the onset date of disability, which are typical indicators of severe pain, and no evidence of nerve root impingement was found. *See Jones v. Sec'y of Health & Human Srvs.*, 945 F.2d 1365, 1369-70 (6th Cir. 1991). Examination findings between March 30, 2003 to December 27, 2004 were often essentially normal with notations made that Plaintiff had good muscle strength, normal reflexes, intact sensation, and lack of focal deficits. Although inconsistent, the records also show that Plaintiff had a normal gait on occasion. (Tr. 140, 159, 200-01, 152, 156-57, 185, 189, 191). While a decreased range of motion was noted, this was effectively treated by surgery. (Tr. 191).

Furthermore, the ALJ cited to several other factors to support his credibility determination, such as: (1) Plaintiff's demeanor at the hearing; (2) Plaintiff's claim that he had epidural injections despite record evidence that he had refused to have them; (3) lack of emergency medical care for his back and leg pain prior to his elective surgery; (4) opinions of Plaintiff's treating physicians restricting him to a 10-pound weight restriction or sedentary work; (5) inconsistencies between

Plaintiff's statements about his activities of daily living and those made to Dr. Metler and Dr. Hasan. Plaintiff does not contend, and the Court does not find, that the ALJ relied on any improper factors or that he significantly misrepresented the record in any manner in making his credibility assessment. Consequently, the Court finds that the ALJ acted well within his discretion in concluding that Plaintiff's testimony was not entirely credible.

In sum, the court finds that there is ample record support for the ALJ's conclusion that Plaintiff remains capable of performing a limited range of sedentary work and is therefore not disabled.[7]

### RECOMMENDATION

The Commissioner's decision is supported by substantial evidence. Defendant's Motion for Summary Judgment (Docket # 13) should be **GRANTED**. Plaintiff's Motion for Summary Judgment (Docket # 17) should be **DENIED** and his Complaint **DISMISSED.**

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991). Filing objections which raise some issues but fail to raise

---

[7] Plaintiff raises no objection to the ALJ's hypothetical posed by the ALJ to the VE. The hypothetical fully incorporates the RFC found by the ALJ. Thus, the hypothetical provided the VE with an accurate description of Plaintiff's impairments. Therefore, the VE's testimony that there exist a significant numbers of jobs in the Michigan for someone of Plaintiff's age, vocational profile, education, and RFC is sufficient evidence to support a finding that Plaintiff is not disabled. *Varley*, 820 F.2d at 779.

others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Willis v. Secretary*, 931 F.2d 390, 401 (6th Cir. 1991). Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: December 7, 2006                s/ Mona K. Majzoub
                                       **MONA K. MAJZOUB**
                                       **UNITED STATES MAGISTRATE JUDGE**


## PROOF OF SERVICE

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record and Rodney Harrison on this date.

Dated: December 7, 2006                s/ Lisa C. Bartlett
                                       Courtroom Deputy